Filed 4/10/14  P. v. Lopez CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>OLVIN ROBERTO LOPEZ,<br><br>    Defendant and Appellant. | F065211<br><br>(Super. Ct. No. F12600398)<br><br>**OPINION** |

-ooOoo-

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Fresno County.  Jonathan B. Conklin, Judge.

Gabriel Cruz Vivas, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, and Kathleen A. McKenna, Deputy Attorney General, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Cornell, Acting P.J., Kane, J. and Peña, J.

Defendant Olvin Roberto Lopez was convicted of domestic crimes against his wife, Stephanie, and of dissuading her from reporting the crimes. On appeal, he contends insufficient evidence supported the dissuading conviction because the prosecution failed to establish he knew Stephanie had tried to report his crimes to the police. We will affirm.

## PROCEDURAL SUMMARY

A jury found defendant guilty of corporal injury to a spouse (Pen. Code, § 273.5, subd. (a);[1] count 1), assault with a deadly weapon (§ 245, subd. (a)(1); count 2), false imprisonment by violence (§ 236; count 3), and dissuading a witness from reporting a crime (§ 136.1, subd. (b)(1); count 4). The jury found true a dangerous weapon allegation connected to count 1 (§ 12022, subd. (b)(1)). The trial court sentenced defendant to four years in prison.

## FACTS

Defendant and Stephanie had been together for five years and married for a few months. They lived in a house with their three young children.

On March 4, 2012, at about 1:00 a.m., Stephanie was watching television with two of the children. She heard a knock on the side door and saw defendant vomiting on the driveway. He appeared to be drunk. She unlocked the door for him and went back into the living room. About five minutes later, defendant entered carrying an open box of beer. Stephanie told him to put the beer in the kitchen because the children were present. He said he was not going to do it, so she picked it up. He told her not to touch his beer. He grabbed the beer from her and put it back on the coffee table. She asked him why he had not answered his cell phone throughout the day and he told her his battery was dead. She believed he did not want to answer because he was out drinking with his friends.

---

[1] All statutory references are to the Penal Code unless otherwise noted.

Defendant started dozing off. Stephanie told him to go sleep in the bedroom, where their one-month-old baby was sleeping. When defendant got on the bed, the baby started crying. Defendant told Stephanie to come and get the baby. She came in and lay down with them. Defendant said, "'I am trying to sleep. Fuck. I can't sleep in this fucking house.'" Stephanie told him that if he could be out drinking all night, he should be able to tolerate the baby's crying. He told her, "'Shut the fuck up,'" and punched her two or three times with a closed fist on her right shoulder. Then he stood up and said, "'I'm tired of hearing your shit,'" and he hit her three or four times with a closed fist on her head and shoulder.

Defendant walked into the bathroom. When he did, Stephanie walked toward the kitchen to get her cell phone and call 911. But defendant came out of the bathroom and approached her before she could reach the kitchen. He told her, "'You like when you get—you get happy when you make me mad. You are not going to be happy until I kill you.'" This statement scared Stephanie. Defendant cornered her and hit her on the head and shoulders seven or eight times, causing bruising and swelling on her face and eye. Stephanie pushed him away with a baby walker. He said, "'You really want to see me mad,'" and he walked into the kitchen. She ran into the bathroom, closed the door, and pushed her back against it to hold it closed. She was afraid. Defendant told her to open the door, and he was able to push it open. When she turned to face him, she saw that he was holding a metal fork in his hand. He began to attack her with a slicing motion across the front of his body. She put her hands up to defend herself and he struck her forearms with the fork. He pushed her into the back of the bathroom and trapped her there, now attacking her with downward thrusts of the fork. Blood from her wounds dripped onto the floor.

The baby started crying in the bedroom, so defendant left and walked to the bedroom. He returned with the baby in one arm and the fork in the other. He swung the fork at Stephanie again, but failed to make contact. She said the baby was hungry. He

told her to do something to quiet the baby, and he let her go into the kitchen to prepare a bottle. She did and handed the bottle to defendant. He took the bottle and the baby into the bedroom. At that point, Stephanie picked up her cell phone and left the house through the side door. She called 911. But before she could say anything, defendant came out, grabbed the phone, and hung it up. As he was holding the phone, it started to ring. He looked at the caller's identification and asked Stephanie why the Reedley Police were calling. She did not answer him. Defendant took the phone inside and locked the doors.

Stephanie went to a neighbor's house to call the police, but the neighbor did not have a telephone. She then walked to the local market and called from a pay phone. She was afraid for her children's safety because they were alone with defendant in the house.

At about 3:00 a.m., the 911 dispatch received Stephanie's call. She reported that defendant had hit her and stabbed her with a fork. She stated that he had locked her out and he was still in the house with the children. She said, "I was calling like three times from my cell phone and he grabbed it from me and he went inside and he locked me out and then I went to a neighbor's house but they didn't have a phone. So I walked over here to the payphone."

Moments later, a police officer responded to the market and found Stephanie waiting by the pay phone. She was visibly upset and shaken, and she was crying. She had cuts and scrapes on both forearms, which were bloody. She also had a puncture wound on her right upper breast. She told the officer that defendant had been drinking and they got into a fight when he came home. He attacked her with a fork. Now he was locked in the house with their three children. The officer and Stephanie immediately went to the house.

After defendant was removed from the house and taken into custody, the officer went into the bedroom and found a baby asleep on the bed. The fork was on the floor. Stephanie gave the officer a statement describing the events detailed above.

4

While at the jail, defendant made numerous telephone calls to Stephanie. Five of the calls were played for the jury. In these calls, defendant told her he was facing a lot of prison time and the only option was for her to go to the police station and tell them it was not true that he hit her. She should say that she accused him only because she was mad. He said, "The only thing you can do is call and say that it's not true. That you already had those bumps because when I go to court that's what I'm going to say." She should say she got hurt when she collided with a woman outside. He repeatedly told her to get rid of the charges against him and get him out of jail by going to the police station to tell them she wanted to take back her statement. She should tell them she lied and he did not do anything to her. He told her to say that she fell in the bathroom and hurt her head and that she already had the injuries when he got home. She should say that she thought he was with a woman and she accused him because she was mad. Stephanie told defendant he should have come home to his family instead of going out with his "good-for-nothing" friends. She told him, "You know well, [defendant], how you get after you've been drinking." He told her, "I promise you Stephanie, if you could see how down I am for doing what I did to you. But it hurts me a lot that you called the cops on me that I don't know how to feel. On one side I'm feeling that I need you[,] that I'm missing you, that I can't be without you[,] but on the other side I remember when you called the cops knowing the problems that I had; you know." She told him she saw the devil in him that day and he almost killed her. She said the district attorney was charging him because they saw her face. He answered that he wanted her to come and say it was not true that he hurt her. She asked, "How do you want me to go and say it's not true when I'm all beat up? [¶] … [¶] You think … that I will stand in front of the judge with the arms all bruised, with the face all, the eye almost coming out, the side of the face I have it all hurt, I have a busted lip. And I'm going to say[,] 'Oh I fell and all of this happened.'?" She said, "Seriously you want me to go? I know that they're not going to believe me. When the judge sees how you left … you don't even have an idea how you left me." He

5

answered, "'Cause I want (unintelligible) that I didn't do anything to you. That it was something else that happened."

At trial, Stephanie recanted. She explained that she had lied when she accused defendant of attacking her. She testified that she found defendant drinking at a crowded bar with a woman sitting on his lap. Stephanie approached the woman and got into a fight with her. This was how Stephanie received her injuries. Stephanie left in her car, picked up the children, and went home. Defendant's friend dropped him off at home later. Defendant was so drunk that he vomited outside before entering, then fell asleep on the couch. She told him to go to bed. As he did, she asked him about the woman. He told her to let him go to sleep. She told him to get his things and get out. When he would not leave, she called the police because she did not want him in the house. After she made the call on her cell phone from inside the house, she hung up. She went outside to take a walk, leaving her cell phone inside the house. When she returned, the door was locked. She got mad and called the police again from the market. She lied when she told the police that defendant had threatened her and hurt her. She made things up that were not true.

A spousal abuse expert testified that it is very common in domestic abuse cases for the arrested perpetrator to contact the victim and tell her to recant and convince the police she had lied.

### Defense Evidence

José Ramos[2] was out drinking with defendant that night. Defendant drank a lot and was intoxicated. He was with a woman. Stephanie called defendant 30 or 40 times, but he turned off his phone because he knew it was her. She also called José about 10 times. When José answered, he told her they were drinking at a particular bar. She came to the bar and argued with the other woman. They got into a fight, punching and hitting each other. José and defendant stepped aside. The bar was very dark so it was

---

**2**    The transcript also refers to José as Joseph.

difficult to see the fight. No one tried to stop it. José told defendant, "Let's go," and they left. José did not know when Stephanie left the bar.

## DISCUSSION

Defendant contends the evidence was insufficient to support the conviction because there was insufficient evidence demonstrating that he knew Stephanie had called or was attempting to call the police to report a crime. We disagree.

In reviewing the sufficiency of evidence to support a conviction, we examine the entire record and draw all reasonable inferences in favor of the judgment to determine whether there is reasonable and credible evidence from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Streeter* (2012) 54 Cal.4th 205, 241.) We do not redetermine the weight of the evidence or the credibility of witnesses. (*People v. Albillar* (2010) 51 Cal.4th 47, 60.) And we must accept logical inferences that the jury might have drawn from the evidence even if we would have concluded otherwise. (*Streeter, supra,* at p. 241.)

"Section 136.1 criminalizes trying to dissuade a victim from reporting a crime." (*People v. Upsher* (2007) 155 Cal.App.4th 1311, 1320.) "To prove a violation of section 136.1, subdivision (b)(1), the prosecution must show (1) the defendant has attempted to prevent or dissuade a person (2) who is a victim or witness to a crime (3) from making any report of his or her victimization to any peace officer or other designated officials. Section 136.1, subdivision (b)(1) does not require that the defendant act knowingly and maliciously. (*People v. McElroy*[ (2005)] 126 Cal.App.4th [874,] 881.)"[3] (*Ibid.*) The prosecution must also prove "the defendant's acts or statements [were] intended to affect or influence a potential witness's or victim's testimony or acts …." (*People v. McDaniel* (1994) 22 Cal.App.4th 278, 284.) Intent is rarely shown

---

[3]    Under certain circumstances, section 136.1, *subdivision (c)* makes the offense in subdivision (b)(1) a felony where the person undertakes the acts of dissuasion knowingly and maliciously. (See *People v. Upsher, supra,* 155 Cal.App.4th at p. 1320.)

by direct proof and "generally must be established by circumstantial evidence and the reasonable inferences to which it gives rise." (*People v. Buckley* (1986) 183 Cal.App.3d 489, 494-495.)

Here, the record provides ample evidence from which the jury could reasonably infer that defendant intentionally acted to prevent Stephanie from speaking to the police and reporting his crimes. After defendant's brutal attack on her, Stephanie eventually succeeded in getting her cell phone, taking it outside, and calling 911. Defendant followed her outside, grabbed the cell phone from her, and hung it up. Defendant argues that he was unaware Stephanie had dialed 911, but his grabbing the phone and hanging up the call suggest otherwise. Furthermore, the police immediately called back while defendant held the phone. He was aware they were calling because he asked Stephanie why they were calling. Then he took her cell phone back into the house and locked her outside without it. His actions clearly prevented her from reporting his crimes to the police. And if there were any doubt that he did so intentionally, his incessant postarrest attempts from jail to silence Stephanie and convince her to recant demonstrated his controlling character and supported the conclusion that his prearrest attempts were similarly intentional. The evidence was more than adequate to support the conviction.[4]

## DISPOSITION

The judgment is affirmed.

---

[4]    Defendant's argument that the only evidence to support the conviction was Stephanie's hearsay statements to the officer the night of the incident, which Stephanie later recanted, merely points out a conflict in the evidence. It was solely the province of the jury to weigh conflicts and inconsistencies in the witnesses' testimony and to evaluate the witnesses' credibility. (See, e.g., *People v. Young* (2005) 34 Cal.4th 1149, 1181.) We cannot reject the jury's findings on appeal unless the evidence on which the jury relied was physically impossible or inherently improbable—and it was not. (*Ibid.*)